ANDREW M. CALAMARI (AC-4864)
Associate Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
Room 400
New York, New York 10281-1022
Telephone No.: (212) 336-1020
Fax No.: (212) 336-1323

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

SAKS INCOPORATED,

    Defendant.

---

07 Civ. _____ (_____)

COMPLAINT

Plaintiff Securities and Exchange Commission, for its complaint against defendant Saks Incorporated ("Saks" or the "Company"), alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises out of misconduct within the Company's Saks Fifth Avenue Enterprises division ("SFAE"), and the resulting misstatement of the Company's earnings. From at least 1999 until 2003, certain SFAE employees engaged in two deceptive practices to achieve monthly, quarterly and seasonal financial targets. Throughout that period, Saks set aggressive ~ial targets for SFAE and some SFAE employees believed they were expected to achieve ·deceptive means if necessary. In addition, as a result of its inadequate internal

controls, Saks failed to detect or adequately address the misconduct at SFAE. As a result, Saks reported inflated earnings for the Company's 2000 through 2003 fiscal years and the second quarters of the 1999 and 2001 fiscal years.[1]

2. One of the practices involved the intentional understatement, by certain SFAE buyers to vendors, of the sales performance of the vendors' merchandise. Over a dozen employees participated in this practice, which continued for at least eight years, from 1996 until 2003. Based on that misinformation, SFAE collected from the vendors millions of dollars in "vendor allowance" or "VA" payments to which the Company was not entitled, causing Saks to overstate its income for numerous reporting periods.

3. The second practice involved the improper deferral (or "rolling") of permanent markdowns from one period to another at SFAE, and also began in the mid-1990s. Permanent markdowns were the means by which Saks recognized that inventory on the sales floor could not sell at the existing retail price, i.e., was impaired. The effect of a permanent markdown on Saks' financial statements was to reduce the value of all inventory subject to the markdown on Saks' balance sheet and also to increase its expense for cost of goods sold, thus reducing the net income reflected on the Company's income statement. Thus the improper rolling of markdowns resulted in Saks' overstatement of its inventory and net income in some reporting periods from which permanent markdowns were deferred.

4. Both improper practices inflated Saks' reported earnings by significant amounts. As a result of the vendor allowance over-collection, Saks overstated its net income for the fiscal year ended February 3, 2001 ("fiscal year 2000") by $5.422 million or 7.0%; overstated its net income for the fiscal year ended February 2, 2002 ("fiscal year 2001") by $4.183 million or

---

[1] The Company's fiscal year ends the Saturday closest to January 31st. For example, Saks' fiscal year 2000 ended on February 3, 2001.

2

32.3%; and overstated its net income for fiscal year ended February 1, 2003 ("fiscal year 2002") by $5.159 million or 42.6%. Saks also overstated its net income by $2.593 million or 3.6% for the fiscal year ended January 31, 2004 ("fiscal year 2003"). As a result of the markdown rolling, Saks overstated its net income in the second quarter of fiscal year 1999 by $8.730 million or 86.5%; understated its net income in the third quarter of fiscal year 1999 by $9.054 million or 25.9%; understated its loss in the second quarter of fiscal year 2001 by $6.771 million or 10.4% and overstated its loss in the third quarter of fiscal year 2001 by $6.940 million or 46.9%. These misstated results were reflected in Saks' financial statements filed with the Commission on Forms 10-K and 10-Q and a press release filed on Form 8-K.

## JURISDICTION

5.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), and seeks to restrain and enjoin the defendant from engaging in the acts and practices alleged herein. This Court has subject matter jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(5), 78u(e) and 78aa.

## THE DEFENDANT

6.      **Saks Incorporated** is a Tennessee corporation headquartered in New York, New York, and engaged in the luxury department store business. Saks' common shares are registered with the Commission pursuant to Section 12(b) of the Exchange Act and trade on the New York Stock Exchange under the symbol "SKS." From 1994 through 1998, Saks (then called Proffitt's, Inc.) acquired six department store chains, culminating in the September 1998 acquisition of Saks Fifth Avenue, a publicly-traded luxury department store company headquartered in New York. From 1998 through 2006, Saks managed its stores through two operating groups: (a)

SFAE, which included the Saks Fifth Avenue luxury department stores and the related Off Fifth outlet stores, and (b) the Saks Department Store Group, which consisted of several regional chains (including Proffitt's and Carson Pirie Scott) and Club Libby Lu.

## FACTS

### Background

7. At all relevant times, Saks' fiscal year has ended on the Saturday closest to January 31 and has been divided into two six-month retail seasons: spring (roughly February through July) and fall (roughly August through January).

8. Before the beginning of each season, Saks gave SFAE aggressive financial performance targets, including targets for sales, gross margin, expense and profit. SFAE broke these targets down into monthly sales, markdown, gross margin and inventory targets -- known as "the plan" -- for each of SFAE's six divisions (such as jewelry, men's clothing and women's designer clothing) and every department within the divisions.

9. The SFAE plan (and, by extension, the overall gross margin target) informed many decisions made at SFAE, including the amount of merchandise that each buyer could purchase during a period, the amount and timing of markdowns to be taken within each department, and the amount of vendor allowance that a buyer should collect.

10. SFAE employees placed great importance on meeting the plan, and the importance of achieving the plan targets was frequently reinforced by SFAE management, including at biweekly meetings with the managers of each division, known within Saks as the open-to-buy meetings. The open-to-buy meetings invariably focused on each division's actual and projected sales, markdowns and inventory figures as compared to the plan. When a division was not performing well compared to its plan, SFAE management directed the buyers and their

supervisors to find a way to achieve the necessary results by, among other methods, collecting additional vendor allowance, rolling markdowns, returning goods to vendors, cancelling orders for new merchandise, conducting promotional events, or accelerating the receipt of goods to increase sales.

**The Vendor Allowance Over-Collection**

11. Vendor allowance – or VA – was a method by which Saks and a vendor shared the risk that the vendor's merchandise would not sell at full price, and consequently, a means to assist Saks in achieving a particular minimum profit margin from its sale of the vendor's merchandise. The more Saks had to mark down the vendor's merchandise in order for it to sell, the more the vendor was expected to compensate Saks in additional vendor allowance.

12. Vendor allowance took on great importance at SFAE because it was a critical tool for buyers to achieve the markdown and profitability targets in the plan. Because SFAE treated vendor allowance as an offset against markdowns (a component of cost of goods sold), buyers with markdown numbers in excess of plan could bring their net markdown numbers within plan by collecting more vendor allowance.

13. The collection of vendor allowance also increased Saks' reported net income. When Saks obtained vendor allowance, it issued a debit memo against the accounts payable due to the vendor, which effectively reduced the amount Saks owed to its vendor and also lowered its cost of goods sold, thereby increasing net income. Thus, as buyers collected more VA, Saks' expenses were reduced and Saks' net income increased.

14. From at least 1996 until 2003, certain buyers in SFAE's women's bridgewear and special sizes division (known within SFAE as Division 2) intentionally provided false sales and markdown information to some vendors in order to collect additional vendor allowance and thus

better achieve their markdown and other plan targets. For example, certain Division 2 buyers periodically gave vendors "profitability reports" that were supposed to update the vendors on the performance of their merchandise over the course of the season. The reports purported to provide the vendor with actual season-to-date figures for, among other things, full price sales, sales after the first markdown and sales after the second markdown. (Merchandise was generally marked down twice, excluding temporary reductions, during a season.) The reports also purported to project sales and markdowns, among other things, for the balance of the season. In some cases, buyers intentionally understated the amount of merchandise sold at first markdown and overstated the amount sold at second markdown, to create the appearance that merchandise sold at a lower price than it really had. In other cases, the buyers made dire end-of-season projections, knowing that the vendors would be too busy with the next season to seek confirmation of end-of-season numbers.

15. As a result of the improper VA over-collection described above, Saks materially overstated its net income for fiscal years 2000, 2001 and 2002 by $5.422 million (7.0%), $4.183 million (32.3%) and $5.159 million (42.6%), respectively. Saks also overstated its net income for fiscal year 2003 by $2.593 million (3.6%). These misstated results were incorporated in Saks' Forms 10-K filed with the Commission for its fiscal years 2000, 2001, 2002 and 2003.

**The Improper Markdown Rolling**

**Markdown Practices at Saks**

16. There were two types of markdowns at Saks. The first type, known as a point-of-sale ("POS") markdown, was temporary; the second was a permanent or "hard" markdown. Saks generally used a POS markdown in connection with holidays or promotional events. For a POS markdown, Saks would typically place percentage-off signs above racks of clothes or other sale

merchandise. At the conclusion of the POS event, Saks removed the signs and the goods reverted to the higher pre-sale price. When Saks determined that an item could no longer be sold at its then current price, Saks took a permanent, i.e., hard, markdown. Hard markdowns were the primary means by which Saks recognized that the value of its inventory was impaired.

17. Hard markdowns had an immediate impact on Saks' income statement. When the retail value of inventory was lowered through the use of hard markdowns, the cost of goods sold also increased and income decreased accordingly. Saks' balance sheet was also affected because the carrying value of the marked-down inventory reflected on the Company's consolidated balance sheet decreased in accordance with a predetermined cost-to-retail ratio.

18. POS markdowns, by contrast, affected cost of goods sold and inventory valuation only when, and to the extent, an item was sold at the sale price. The value of the unsold inventory subject to a POS markdown was presumed to be unimpaired, reflecting the Company's expectation that the remaining goods would be sold at the higher pre-sale price after the conclusion of the POS event.

19. Thus, if inventory on SFAE's sales floor was impaired, but SFAE took a POS markdown instead of a hard markdown, the carrying value of the inventory would be artificially high, cost of goods sold artificially low, and, unless an appropriate reserve was established, Saks' net income would be overstated.

**The Improper Markdown Rolls**

20. "Markdown rolling" referred to the deferral of hard markdowns to a subsequent period from the period in which the markdown was planned or in which the buyer requested to take the markdown. Markdown rolls at Saks were sometimes dictated by legitimate business considerations -- for example, an unseasonably cold winter might prompt Saks to delay a

7

scheduled markdown of winter coats. However, at other times, markdown rolls were used at SFAE to improperly delay the impact of impaired inventory on the division's financial results and thus to better achieve the seasonal gross margin target set by Saks. These improper markdown rolls caused Saks' inventory and income to be overstated in the period that the markdowns should have been taken.

21. Hard markdowns were usually initiated by requests from the buyers, who were generally in the best position to observe the selling performance of the merchandise in their departments and to determine whether the value of the goods had been impaired. The buyers' requests for hard markdowns had to be approved by SFAE management.

22. On at least two occasions -- the second quarters of 1999 and 2001 -- SFAE used a markdown roll in an attempt to achieve the seasonal gross margin target set by Saks. On those occasions, because the plan, particularly the gross margin target, could not accommodate all of the markdowns requested by buyers, SFAE took POS markdowns instead of hard markdowns, even though the markdowns were not intended to be temporary. SFAE then took hard markdowns at the beginning of the following quarter. In these instances, the rolling of markdowns essentially moved an expense from one quarter to the next and resulted in Saks' failure to comply with Generally Accepted Accounting Principles, which require inventory to be written down when its value is impaired.

23. As a result of these improper markdown rolls, Saks overstated its net income in the second quarter of fiscal year 1999 by $8.730 million or 86.5%, understated its net income in the third quarter of fiscal year 1999 by $9.054 million or 25.9%, understated its loss in the second quarter of fiscal year 2001 by $6.771 million or 10.4% and overstated its loss in the third quarter of fiscal year 2001 by $6.940 million or 46.9%. These misstated results were

incorporated in Saks' Forms 10-Q filed with the Commission for the second and third quarters of 1999 and 2001. In addition, the misleading financial results from the second quarter of 2001 were contained in an earnings release, filed with the Commission as an exhibit to Saks' August 27, 2001 Form 8-K.

**Saks' Belated Discovery and Disclosure of the Deceptive Practices**

24. During the relevant period, Saks lacked adequate internal controls to guard against the collection of vendor allowance to which it was not entitled and the resulting improper recording of income. The Company also lacked adequate internal controls to ensure the proper valuation of inventory and proper charges to cost of goods sold.

**The Flawed 2002 Investigation**

25. In August and September 2002, certain vendor allowance over-collection at SFAE came to the attention of senior Saks management. As a result, Saks conducted an internal investigation. That investigation was flawed and failed to detect the full scope of the problem. The internal investigation identified only $716,000 in over-collection, from one vendor, by a single Division 2 buyer and an assistant buyer, during one retail season. In fact, by the time of the investigation, the vendor allowance over-collection amounted to approximately $30 million dollars, extended to approximately twelve vendors, involved approximately eleven buyers and assistant buyers as well as the manager of an SFAE division, and had occurred over seven fiscal years.

26. Saks adopted some new policies and procedures following the internal investigation. Saks failed, however, to adopt and maintain policies and procedures reasonably designed to prevent the over-collection of vendor allowance and ensure the accuracy of its

recording of vendor allowance. SFAE buyers continued to over-collect vendor allowance, to a lesser extent, after the internal investigation and the adoption of the new policies and procedures.

### The Restatement and Disclosure of the Improper Markdown Rolls

27.   In October 2004, after a vendor sued Saks for, among other things, the over-collection of vendor allowance, Saks' audit committee launched a new, more comprehensive investigation of Saks' vendor allowance collection practices. In May 2005, the scope of the audit committee investigation was expanded to cover, among other things, markdown rolling.

28.   As a result of the audit committee investigation, Saks determined that it had over-collected $26 million in vendor allowance during the fiscal years 1999 through 2003 and an additional $8.2 million during fiscal years 1996 through 1998. The Company also determined that two improper markdown rolls had occurred, resulting in the misstatement of income in the second and third quarters of 1999 and the second and third quarters of 2001. On September 1, 2005, Saks filed a Form 10-K, restating its financial results for fiscal years 1999 through 2003 and the first three quarters of 2004.

29.   Among other things, Saks restated to correct for its improper accounting for vendor allowance, which had a significant impact on its reported income for the 2000, 2001, and 2002 fiscal years, as shown below.

### Impact of Vendor Allowance (VA) Over-Collection
(in thousands)

|  | **FY 2000** | **FY 2001** | **FY 2002** | **FY2003** |
|---|---|---|---|---|
| Restated net income (loss) | $76,812 | ($12,948) | $12,109 | $72,364 |
| Restatement as a result of VA adjustments | ($5,422) | ($4,183) | ($5,159) | ($2,593) |
| **Percentage by which net income was overstated due to VA over-collection** | 7.0% | 32.3% | 42.6% | 3.6% |

30. In the September 2005 Form 10-K, Saks also disclosed that, as a result of improper markdown rolling: (1) the Company's operating income for the second quarter of fiscal year 1999 was overstated by approximately $14.5 million – or 30.1% -- and the Company's operating income for the third quarter of fiscal year 1999 was understated by approximately $14.5 million -- or 16.2%; and (2) the Company's operating income for the second quarter of fiscal year 2001 was overstated by approximately $11 million – or 13.8% -- and the Company's operating income for the third quarter of fiscal year 2001 was understated by approximately $11 million, converting an operating profit to an operating loss.

31. The effect on Saks' reported net income of the improper inventory accounting caused by the markdown rolls is shown below.

**Impact of Improper Markdown Rolls**
(in thousands)

|  | Q2 1999 | Q3 1999 | Q2 2001 | Q3 2001 |
|---|---|---|---|---|
| Reported net income (loss) | $18,819 | $25,900 | ($58,389) | ($21,753) |
| Pro forma net income (loss) if markdowns had not been rolled* | $10,089 | $34,954 | ($65,160) | ($14,813) |
| **Percentage by which pro forma net income (loss) was overstated due to markdown roll*** | 86.5% | -25.9% | 10.4% | -46.9% |

* Based on reported net income, disclosed impact on operating income, and application of reported effective tax rates for the respective periods.

## FIRST CLAIM FOR RELIEF

(Violations of Section 13(a) of the Exchange Act
and Rules 12b-20, 13a-1, 13a-11 and 13a-13)

32. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 31, above.

33. As described above, Saks failed to file with the Commission such financial reports as the Commission has prescribed, and failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

34. By reason of the foregoing, Saks violated, and unless enjoined, will continue to violate, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a.1, 240.13a-11 and 240.13a-13.

## SECOND CLAIM FOR RELIEF

(Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act)

35. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 34, above.

36. As described above, Saks failed to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets, and failed to maintain a system of internal accounting controls that permit the preparation of financial statements in conformity with generally accepted accounting principles.

37. By reason of the foregoing, Saks violated, and unless enjoined, will continue to violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

1. Enter a Final Judgment permanently restraining and enjoining defendant Saks, its officers, agents, servants, employees, attorneys and all persons in active concert or participation

with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B), and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13; and

    2.    Grant such other and further relief as the Court deems appropriate.

Dated: September 5, 2007
New York, New York

Respectfully Submitted,

_____
Andrew M. Calamari (AC-4864)
Associate Regional Director

Attorney for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
3 World Financial Center
Room 400
New York, NY 10281-1022
Tel. (212) 336-1020

Of Counsel:    Leslie Kazon
                Celeste Chase
                Michael Paley